# EXHIBIT A

**IN THE UNITED STATES DIRECT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

| | |
|---|---|
| **LOTTOTRON, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civ. No 2:09 –cv-04942** |
| | )   **FSH-MAS** |
| **v.** | ) |
| | ) |
| **EH NEW VENTURES INC.**, *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

**EXPERT REPORT OF MELISSA K. BLAU**

I, Melissa K. Blau hereby submit this expert report in the afore-captioned manner.


## I.  EXPERT WITNESS BACKGROUND

I am the Founder and Director of iGaming Capital Ltd., a specialist advisory and investment company based in London, United Kingdom that is dedicated to the online gaming sector. I have been in the Gaming, Media Technology and Finance sectors for over 24 years and specifically in the online gaming sector for over 6 years.


I first entered the gaming sector in 1991 covering the sector in Investment Banking. After completing my graduate degree at Harvard Business School (1995), where I wrote my final thesis on entering the online gambling sector, I joined Viacom, Inc. in their Viacom Interactive Services division as a Manager of Strategic Planning and Business Planning advising the all of the divisions (MTV, VH1, Paramount, Nickelodeon etc…) on their digital strategies. In 1997, I co-founded a Media Technology fund called Constellation Ventures (part of Bear Stearns Asset Management) totaling $450m under management and invested in 22 companies. I left Constellation Ventures a year after the Internet correction and just after September 11 2001. After an extensive non-compete, I decided to return to gaming and specifically the sector of online gaming by moving to the UK where the industry was thriving.

I began my career in the online gaming industry in the fall of 2004 as the CFO of Gibraltar based gaming operator St. Minver (now part of GTECH). Leveraging my prior financial expertise as a General Partner Constellation Ventures, I joined Global Leisure Partners (GLP), a boutique merchant bank dedicated to the gaming industry to build out their online gaming practice. There I advised both online and land based gaming companies in financing alternatives as well as separately consulting on their online operations working with specific companies to launch or re-launch their online gaming operations. (This marked the beginning of iGaming Capital). In my capacity as the Director of iGaming Capital in conjunction with one of the partners of GLP, we launched Europa Point Group, a privately funded operating acquisition vehicle dedicated to the online gaming Sector. As the CEO of Europa Point, I was responsible for acquiring, launching and managing a number sports betting properties (BetUK, BetAsia and Betrepublic).  After my tenure at Europa Point, I joined Live Gaming Technology (LGT) which owned live gaming operator, CasinoTV was an investor and CEO.

Since starting iGaming Capital, I have regularly consulted for a number of the leading online gaming companies in addition to the employment above including Sisal, the second largest Italian land based gaming operator and The Racing Post, a leading UK newspaper dedicated to the racing industry.  With the recent momentum of the changing in the online gambling laws in the United States, I have now decided to consult full time and focus my efforts here in the United States. Through iGaming Capital, I am advising Nevada based gaming supplier, Bally Technologies on an exclusive basis working with the senior management to help better understand the complexities of online gaming sector as well as devising a number of alternatives in entering the online gaming sector.

In addition to my current capacity, I am also the Financial Section Editor of IGaming Business Magazine, the leading magazine dedicated to the online gaming sector where I cover the sector in a number of capacities including a regular contributing writer. I am also a regular speaker at many of the online gaming events (G2E, EIG, London Affiliate Conference, Women in Gaming, iGaming Supershow (Finance Track Chairman) etc. .. and have recently testified as an expert witness on behalf of the online gaming industry  at the 3rd Gaming Summit for the State of New Jersey on September 29, 2010 before the Democratic

lawmakers in both the State Senate and Assembly.  Further details of my background, experience and education are included in Exhibit A for your review.

As an expert who is skilled in the art and methods of online/remote gambling, I am being compensated for my work on this matter at a rate of $400 per hour. I have been retained by the lawyers on behalf of Interactive Systems Inc., ("ISI") to render an opinion on the issue of infringement of the plaintiff's, Lottotron, Inc ("Lottotron') U.S Patent Number 5,921,865 ("the '865 Patent") entitled Computerized  Lottery Wagering System whose final amendment was granted on Jul 13th, 1999 and which is the result of a series of prior patents that were sequentially filed in Jan. 1997, Apr. 1995, Jan. 1994, Jan 1993 and initially filed in Mar. 1990.

## II.  THE BACKGROUND ON THE ASSIGNMENT

According to the materials provided, I am aware that Lottotron is of the belief that ISI's Sportbetting.com website which offers online gambling including a variety of casino games is in infringement of the '865 Patent. Lottotron has brought a claim for the patent infringement against ISI alleging that ISI infringes on the '865 Patent by offering a 'multiple game, on-line wagering format.' (Cmplt.¶ 22).

**The Test of Patent Infringement**

ISI in its belief that it did not infringe on the '865 Patent filed for Summary Judgment of Non-Infringement.  To prove Summary Judgment, the appropriate tests required proving of non-infringement by a preponderance of the evidence. With regard to literal infringement, the patentee must prove every step in the method is performed by the accused process, either literally or under the doctrine of equivalents. For literal infringement the accused product or process must 'contain each limitation of the claim exactly' and there cannot be 'any deviation from the claim.' (*Litton Sys. V. Honeywell*, 140 F. 3rd 1449, 1454 (Fed. Cir. 1998). If each limitation is not satisfied exactly, infringement may still be found under the doctrine of equivalents, but only if the difference between the claim limitation is not present literally and

3

the corresponding element in the accused device or process is "insubstantial". Whether an element of the accused device is equivalent to a claim limitation depends on "whether the substitute element matches the function, way and result of the claimed element". *Warner-Jenkinson Co. v Hilton Davis Chem Co.,* 520 U.S. 17, 39-40 (1997) at 39-40. Namely and with regard to *Lottotron, Inc., v. EH New Ventures, Inc., et al*, do the games on ISI's Sportbetting.com perform  "substantially the same function in the substantially the same way to obtain the same result." *Id.* at 35 as those covered by the '865 Patent. (also referred to as the Function-Way-Result Test).

In *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, , Order & Opinion (D.N.J) Nov. 15 2010) ("Summary Judgment Opinion') Judge Hochberg clearly puts forth

> Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson v. Hilton Davis Chemical,* 520 U.S. 17, 21 (1997).
>
> Put another way, "[t]he doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., Ltd., 535 U.S. 722, 733 (2002).
>
> Equivalence exists between elements of the allegedly infringing product or process and the patented invention where, "the differences between the two are 'insubstantial' to one of ordinary skill in the art....[T]he insubstantial differences inquiry may be guided by determining whether the element in the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp*., 320 F.3d 1339, 1351 (Fed. Cir. 2003) (internal quotations omitted).

Applying the definition above to Claim 8 of the '865 Patent including its amendments in 1998, ISI contends that the games offered on the Sportsbetting.com site are substantially different from "the kind of lottery games that are available, such as Keno, Lotto and 3- or 4- digit lotteries" which are covered by the '865 Patent.

The Court, then goes on to state that 'under the doctrine of equivalence, the relevant inquiry is whether, in the view of one of ordinary skill in the art the games offered on ISI's website are "insubstantially different" from the "kind of lottery games that are available, such as Keno, Lotto and 3- or 4- digit lotteries" covered by the '865 Patent.' *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, , Order & Opinion (D.N.J) Nov. 15 2010) ("Summary Judgment Opinion'). The Court has now left to the Plaintiff to prove that the ISI games are equivalent to the defined Wagering Format the "kind of lottery games that are available, such as Keno, Lotto and 3- or 4- digit lotteries"  under the Function-Way-Result Test.

**"Wagering Format" Defined**

I am also aware that through a series of previous cases whereby Lottotron has litigated against numerous companies with regard to the '865 Patent, the method of the '865 Patentis defined to specifically 'enable a subscriber to place lottery wagers through a telecommunication means, such as the telephone, in one or more available lotteries.' *Lottotron, Inc. v. GTECH Corp*., No 05-4652 (FLW) 2007 U.S. Dist. LEXIS 82579, .at *2 (D.N.J. Nov. 7, 2007) and whose 'wagering format' is restricted to mean 'the kind lottery of games that are available, such as Keno, Lotto, and 3- or 4- digit lotteries'.*" Lottotron v. Scientific Games Corp*., No. 03 Civ 0920 (HB), 2003 U.S. Dist. LEXIS 15507 (S.D.N.Y Sept, 9, 2003).

With regard to this case *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, , Order & Opinion (D.N.J) Nov. 15,  2010 ("Summary Judgment Opinion') Lottotron contends that the "Wagering Format" as defined above as 'the kind lottery of games that are available, such as Keno, Lotto, and 3- or 4- digit lotteries' to include all games of chance including those found in a traditional casino such as table games, slots and video poker.

The Court, however, in its Summary Judgment Opinion was clear that given the repeated use of the term "lottery" throughout the '865 Patent, the games strictly referred to herein are 'limited to the kinds of games typically available through the state lotteries'.

**'865 Patent Remote Gaming Restrictions**

According to *Lottotron, Inc. v. GTECH Corp.*, No 05-4652 (FLW) 2007 U.S. Dist. LEXIS 82579, at 16-17 (D.N.J. Nov. 7, 2007) 'when a specification excludes certain prior art alternatives from the literal scope of the claims and criticizes those prior art alternatives, the patentee cannot then use the doctrine of equivalents to capture those alternatives" L.B. Plastics, 499 F.3[rd] at 1309-10. Here (*Lottotron Inc. v. GTECH Corp.*) the patentee criticizes prior art methods that require a player to physically go to a lottery agent to place a wager by purchasing a lottery ticket. '865 Patent, col. 1, lines 22-26. The patentee later criticized the prior art, including this traditional method, and touted the advantage of its computerized wagering system. See Mr. Fiscella's Dep. At pp. 20, 46-47 ("The idea was to purchase lottery tickets from the remote location, not having to go to the store to purchase").


**III. PROOF OF SUBSTANTIAL DIFFERENCE**

In reading Judge Hochberg's final opinion in *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, Order & Opinion (D.N.J) Nov. 15, 2010 ("Summary Judgment Opinion') it is clear that in rendering my opinion, I need to specifically address 'the relevant inquiry is whether, in the view of one of ordinary skill in the art the games offered on ISI's website are "insubstantially different" from the "kind of lottery games that are available, such as Keno, Lotto and 3- or 4- digit lotteries" covered by the '865 Patent.'   *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, , Order & Opinion (D.N.J) Nov. 15 2010) ("Summary Judgment Opinion').

In my expert opinion, I believe the games and the supporting platform offered on ISI's Sportsbetting.com website differs substantially from the Wagering Format covered in the '865 Patent by means of:

      i.   Function

     ii.   Way

    iii.   Result

As I demonstrate below, the game along with the supporting platform offered by a typical end-to-end casino platform, includes a wide range of game functionality, features and structure including intricate game flow, varying bet and games types, detailed audio and graphics with well-developed storyboarding, detailed account management systems with advanced eCRM systems, advanced fraud and collusion systems, multi-level bonus management, multi-level affiliate/campaign management, advanced cashier facilities, distributed and scalable hosting facilities and multi-jurisdictional licensing management.

In my expert opinion, after 6 years of working closely with a wide variety of the leading online game developers, remote online gaming platform providers and online gaming operators, I believe it would take an average size operator a minimum of $5-10 million and a minimum of 2 years to build a platform and transform their operationsfrom one that is solely covered by the Wagering Formats and the ticket ordering process depicted in the '865 Patent and one that is offered on the Sportsbetting.com website. (Please note: that in the sections described below, the 'substantial' dollar amounts are included in the above figure and the number of months are not assumed to be sequential but rather simultaneously).

NOTE: in my assessment I am strictly focused on proving that the games are or are not 'insubstantially different' as this was specifically the task at hand per Judge Hochberg's orders. With regard to Mr. Friedman's assessment that diminishes this importance of game differentiation, claiming that ' the invention of the '865 Patent lies in the technology platform for accepting wagers on different games, not in the content of the games themselves' *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, Expert Report of Stacy A. Friedman at 7-8 (D.N.J) Nov. 18 2010), I believe in my expert opinion to be erroneous by fact as well as by nature with regard to the task at hand.  Please note: I shall discuss this in detail in both this section as well as the next section:  Rebuttal of the Lottotron Expert Witness.

In the below analysis, I specifically focus on demonstrating that **the function, way** and **result** of the games offering on the ISI website differs greatly from the games covered by the '865 Patent which defines Wagering Format as 'the kind of lottery games that are available, such as Keno, Lotto and 3- or 4- digit lotteries.'

From a high level perspective, **the function** of the games differ significantly in that pooled based games provides a low risk scenario that is more suitable to government and non-profit institutional organizations that are precluded from taking substantial financial risk. This contrasts to  that of casino-style games whose operators are required to take calculated risk (wagering limits versus bankroll) as an integral part of the operating environment.

They differ in **the way** the game is played in that with lottery, keno bingo or other defined Wagering Formats it is critical for the player to purchase or acquire one or more individual tickets as a requirement to participate in the pre-determined time of the event. In contrast, casino style games do not require a pre-purchased ticketing system as the players are free to wager the amount they desire at any given moment they desire.

Finally the ISI games differ by **the result** from those defined by the Wagering Formats in the '865 Patent in that pooled based games are always played in a group fashion with the number simultaneous players as the key differentiating factor to determining the total payout amount. Casino style games in contrast do not rely on other simultaneous players in order to determine the total payout. Rather the total payout is determined by the individual amount staked  and the player rather than playing in a group or peer-to-peer environment is playing just against the house.

As such, there is virtually no similarity with regard those games on the ISI website and the Wagering Format for the Function Way and Result for the games depicted in the '865 Patent that includes 'the kind of lottery games that are available, such as Keno, Lotto and 3- or 4-digit lotteries'.

Please note the order of the individual sections below is not in any particular order of importance.

1. **Pari-Mutuel or Pooled (Lottery, Bingo, Lotto, 3- or 4- Digit games)versus Games Against the House:  Operator Risk**

One of the most significant difference between the ISI games and the game offered by state lotteries including Lottery, Keno, Lotto and 3- or 4- digit lotteries is the underlying premise of the games which drives a whole host of other differences.  Pari-Mutuel and pooled games such as the games cited in the '865 Patent are peer-to-peer based games whereby the state lottery or the operator acts as a facilitator and takes a commission or a 'vigorish' of a combined pot of a group of people. Offering these games, the operator (or state) takes no risk against player, except with regard to covering seeding of pots or guaranteed payouts. With the casino style games on ISI's website (i.e. with the exception of sports betting) the operator does take financial risk as they are acting as the house against an individual player. It is not surprising that with the pari-mutuel or pooled games the operator is typically a public/state (lottery) or religious institution (bingo) as no risk is borne. With Games Against the House, this is almost always private entities as the risk is borne by the individual shareholders.

If an operator were to expand their game offering and develop the ISI games and platform starting from platform that only included those Wagering Formats covered in the' 865 Patent, it would take a substantial investment and a minimum of 12 months.  *Violation of Equivalence: Function, Way and Result.*

2. **Requirement of Pre-Purchase of Tickets**

The games covered in the '865 clearly require the pre-purchase of one or more tickets (or 'plays´) with each ticket (or play) having a pre-determined value as the only means to place the wager. The detailed descriptions are depicted in both the flow diagrams and supporting verbal descriptions in the '865 Patent, Fig. 5, 5A, 5B, Fig. 6, Fig. 7, Fig.8, Fig. 9 and col 7-9. This is a clear and obvious distinction from the ISI games which do not require such a structure of pre-purchasing a pre-determined value ticket.

Players using ISI games do not purchase any tickets on any of the games and the Wagering Formats covered in the '865 Patent do not offer any games without the requirement of the pre-purchase of tickets. To build a non-ticket based wagering facility that allows players to wager without the need to buying a ticket (including building both the games and the supporting platform) would take a substantial investment and an estimated 12 months. *Violation of Equivalence: Function, Way and Result.*

### 3.   Simultaneous Betting Types: Limited versus Multiple

Currently the Lottotron patent explicitly depicts the Wagering Formats in a detailed step by step process. The process and game description is typical of that of lottery, bingo, keno and lotto games and as such greatly differs from the games on the ISI website in that the Lottotron bets are limited by the functionality of the variation in the betting types on a single game themselves.  In the Wagering Formats covered by the '865 Patent, players are limited to one bet type on a single game, namely, the purchase of a ticket whose value is determined by the constraints of the specific state lottery operator. It is possible that an individual state may offer more than one game (e.g. Powerball, Mega Millions etc.) or the choice to self-select defined set of numbers, but beyond this there is little to no variation in the described Wagering Formats. The ISI games however, offer a variety of betting choices especially games such as roulette (numbers, evens/odds, red/black, dozen, half,  rows, straight, split, street, section, corner) and craps (pass, don't pass, back up pass/don't-pass, come, field, C&E, hard ways, numbers), in addition to 3 types of blackjack, numerous variations of poker, baccarat (banker)  etc..

Developing a suite of games that offers the intricacies and betting engines is complex and one that Mr. Stacy Friedman grossly underestimates in his Expert Report *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, Expert Report of Stacy A. Friedman at 10-12 (D.N.J) Nov. 18 2010). (Please refer to Rebuttal of Expert Witness in next section for greater detail). To build a suite of games and supporting platform starting with a suite of games and order taking system offered in the '865 Patent would require a substantial investment and a minimum of 12-18 months. *Violation of Equivalence: Way and Result.*

**4.   Requirement to Pre-Selecta Pre-determined Variation of Numbers**

All of the games described in the '865 Patent requires a player to pre-select a set number of pre-determined numbers prior to the game to begin. Regardless of the individual state's specific nuance as to the number of total balls or the number of required combination of numbers and regardless if the player opts for the Quick Pick or self-selection of numbers, it is mandatory that the player select or have selected for them a pre-specified set of numbers. This is in sharp contrast to the games offered though the ISI platform. The ISI games allow players to vary their betting patterns for each game they choose. While it is true that Roulette does offer players the ability to bet in a series of numbers, the player has the option to choose vary how many and how much they bet on an individual spin. For example on the games covered by the '865 Patent a player for a Six-Digit Lotto game much choose exactly 6 two digit numbers and may only vary the number of tickets they purchase. In contrast a roulette player has the choice of varying the amounts on each number as well as choosing from between 1 and 36 individual numbers as well as a host of derivative betting types.

The ISI games do not allow the player to pre-select tickets on a pre-determined variation of numbers. Conversely the Wagering Formats defined in the '865 Patent do offer the players the ability to freely choose to wager any amount on a variety of outcomes. Thus the games are substantially different and in order for an operator to be able build the required gaming offering platform would require 12 months of development and substantial resources. *Violation of Equivalence: Way and Result*

**5.   Game Flow/Game Participation**

One of the most obvious differences between the way the games are played with regard to the ISI games and those depicted in the Wagering Format in the '865 patent is specifically relating to what is referred to as the game flow or how the player interacts with the game. In the games defined in the Lottotron Patent, the interaction with the game is quite simple and linear: A Player purchases one or more tickets, after this no more participation or interaction is required of the player. Outside the scope of the '865 patent, the player then waits for the event to begin at the pre-determined time (game schedule software is required), the game is carried out with no input or interactive participation from the player, the game is completed, the player either wins or loses.

11

In contrast, the ISI games are intricate and interactive, whether it is hitting, sticking, splitting or doubling down on blackjack, backing up a passing line on Craps, sticking on Baccarat, holding 3 cards on video poker, or hitting certain bonus rounds on slots,  the games on the ISI platform require a level of programming and process sophistication well beyond that of a simple lottery or keno ticket selling method.  In this scenario, it is the way the games are played differ greatly. The ISI games are based on a basic level of continued interaction and participation by the player. In contrast, the Wagering Formats covered in the '865 Patent do not. The only interaction required by the player is in the process of reaching the desired game (see '865 Patent, Fig. 3) which happens *prior* to the game beginning. In order for an operator to build the critical level of game flow and interactive functionality starting with the Wagering Formats and order taking systems covered in the '865 Patent it would take substantial investment and a minimum of 12-18 months.  *Violation of Equivalence: Function and Way.*

**6.  The Underlying Game Engine**

One of the critical differences in pari-mutuel/pooled based games versus casino style games in the inclusion of a complex mathematical game engine that is require to power the casino style games. The game engine is the underlying mathematical formula that is custom built to allow for example a slot to offer a wide range of permutations and combinations (bells, cherries, gold bars) of one or more lines (a typical multi-line slot machine has 21 to 5 different lines i.e. ways to win in one spin). The game engine is the formula that allows the combination to offer the desired house-edge over a period of time. For many table games, the engine isa bit more simple as it is defined by the set games rules (see wizardofodds.com for detailed explanation).

According to the simplicity that Mr. Stacy Friedman describes in his Expert Report, the complex of the underlying game engine described above is in sharp contrast to the simplicity of the core engine that drives a lottery or other pari-mutuel based game. According to his report, the engine is quite similar in a pari-mutuel or pooled game. Regardless of the number of balls required as part of the game (i.e. pick 3-, pick 4, or pick-N) the prize to the winner is

determined by the pooled amount less the vigorish or commission to the gaming operator (in this case the state lottery) which is a straight percentage off of the total pooled or wagered amount. (Note: I believe in my professional that this is somewhat of an over simplification)

Where I disagree with Mr. Friedman is in his erroneous assessment that a by slotting in symbols for numberson a pari-mutuel basis for 'another set of symbols does not change the mathematical behavior of the game at all.' He goes on to say that 'a pick-2 symbols lottery game where the players choose between AA and JJ would behave identically to one which he players choose between 00 and 99.' Now mathematically he may be right in comparing this exact scenario just ISI doesn't offer any games which allow the player to choose between AA and JJ and moreover, certainly doesn't have the capability to allow the player to buy a ticket with their set of their choice. To compare the game of Roulette to the AA to JJ example would just be plain wrong. As Roulette is not a sequential game and each bet type outside of the 0-36 straight bet has a varying risk and payout level. It is erroneous to compare the game mathematics of a risk-free pari-mutuel game whereby the operator never faces financial risk (unless artificial guarantees are promised) to that of a risk based system where the operator is required to take on financial exposure in interim periods of time.

It requires substantial investment to build a suite of products that offers a sufficient number of game engines for a casino to effectively compete in the market with sufficient game variety. *Violation of Equivalence: Function, Way and Result*

## 7. Non Linear Wager to Payout Ratio (Dynamic Odds Versus Static odds)

With pari-mutuel and pool based games such as those covered in the '865 patent, the amount staked has no correlation to the total amount returned. Rather the total amount returned is depend on the total amount staked (number of players x the average wager) and the total number of winners. Hence the odds of a simple $1 bet is not known until both the total number of wagers is known as well as the number of winners is calculated. This dynamic movement of odds is sharp contrast to that of a traditional style casino games on ISI's website in which the player knows exactly the odds of every wager prior to the wager and the

only variant in determining the total potential return is the amount staked by the individual player.

This is a substantial difference between the two game format and is a *Violation of Equivalence: Function, Way and Result*

### 8. Game Rules and Payout Ratio

While the games rule vary accordingly to each game segment, the difference between casino style games and that of pool based games as those defined by the '865 patent, differs much more significantly.  Due to the traditional high volume/low stake nature of lottery games and the kind of games defined in the Wagering Format, it is very typical to see a state lottery, religious institution or other operator of a lottery, keno or bingo game hold between 30-50% of the amount wagered. This is in sharp contrast to that of a traditional remote casino which will typically only holds 3% of the amount wagered on casino style games like that offered on ISI's site.

Once again proving a substantial difference of equivalence, the material disparity in the payout ratio is one of the core differentiating factors between the ISI casino games and the Lottotron defined wagering formats. *Violation of Equivalence: Way and Result*

### 9. Event Driven Games  (Sports Wagering Excluded)

Each of the games described in the '865 Patent is based on a pre-determined event that is controlled by the operator. The platform that supports a lottery (regardless of the number), bingo or keno game must offer the ability for operators to manage a continuous scheduling program for   the sequencing of the games to begin at a pre-determined time, e.g. hourly, daily, weekly, monthly draws or with bingo the scheduling which games begin at what time typically every 5 minutes.

None of ISI's games offer such scheduling capabilities and as such cannot offer those games as outlined in the '865 patent.  To build such a capability would require substantial investment and a minimum of 6 months to complete.  The inability for ISI to currently offer

game scheduling as required by those games covered in the '865 Patent differs substantially with regard to the function, way and result of the game.

**10. Critical Mass to play the Game**

Another key obvious factor that further demonstrates a substantial difference is the dependence on a critical number of players, or liquidity for the Wagering Formats included in the '865 patent. In order to create a robust playing experience that garners player satisfaction, it is critical that a lottery or bingo operator maintain a base level of continuous simultaneous players this relying heavily on a critical mass to make the payout amounts exciting. This is in sharp contrast to casino style games on ISI which are played on individual basis. Thus a player will have the same exact experience and payout amount regardless of if they are playing at a slot machine or blackjack table. *Violation of Equivalence: Function, Way and Result*

**11. Supporting Platform Requirements**

One of the biggest competitive differentiators in the online gaming industry is the scalability, functionality and intuitiveness of the back-end platform which drives the front end games. As mentioned in the introduction of this section, a tier underlying platform consists of a range of interlocking modules that with the casino games are woven together to create  a competitive online casino offering much like that of ISI's Sportsbetting.com.

The order entry ticket system described in the '865 patent represents a small fraction of what is required to build a robust platform that can effectively compete in the online gaming market. The diagram below represents the components required to offer a competitive online gaming operation. The Wagering Format and other ancillary processes  depicted in the '865 Patent represents only a fraction of what is required to offer a complete system and this is various other software modules as well as a vast majority of the Gaming Platform modules which are missing in the '865 Patent. (Note: the Services module is typically the responsibility of the Gaming Operator, but may also be shared with the Gaming Supplier).

| Consumer Brand | Gaming Operator | | | | | |
|---|---|---|---|---|---|---|
| Digital Distribution | Gaming Machines (Class III, FOBTS) | Internet | Mobile Devices | Tablets (e.g. iPad) | Gaming Consoles | Television |
| Game Content (Software) | Sports Betting/ Exchange Software | Casino Software | Live Dealer Software | Poker Software | Bingo Software | Lottery Software |

| Gaming Platform & Services (Back-end) | Gaming Platform | | | Services | |
|---|---|---|---|---|---|
| | Integrated Cashier | Account Management | Centralized Reporting Tools | Payments (Fraud/RG) | Gaming License |
| | Bonus &Loyalty Tools | Registration Platform | Fraud & Security Tools | Customer Service | Domain Name Acquisition/Mgmt |
| | Network Mgmt Tools | Customer Service System | Affiliate/Agent Software | Affiliate Management | SEO/Site Optimization |
| | Site Optimization Tools | Open (3rd party) API System | CMS/CRM Tools | Account Management (VIP) | Hosting/Load Balancing |
| | Multi Language/ Currency | White Label Tools | Jurisdiction Compliance | Bonus & Loyalty Management | Network/Chat Management |

■ Proprietary Brand    ■ Game content: proprietary or 3rd party    ■ Platform: proprietary or 3rd party

## 12. Advanced Graphics and Audio

One of the key differentiators amongst games providers in the online gaming sector is the quality of the graphics and audio and the storyboard that ties the two together. In this scenario I must rely strictly on my professional opinion as it is impossible to offer visual contrasting visual and auditory proof for this scenario. To my knowledge unless otherwise corrected, currently only ISI's games and/or platform are live (www.sportsbetting.com) and the Lottotron's games and ticket ordering system has yet to garner one customer, paying or non-paying.

Relying on my expertise, I am comfortable with by belief that the games covered by the Wagering Platform in the '865 Patent on a typical site that offers lottery and keno differs substantially from those on the ISI website in that the style games on offered on a site such as ISI on average requires a greater amount of advanced graphics and audio features.

16

### IV. REBUTTAL OF THE LOTTOTRON EXPERT WITNESS

In an effort to demonstrate a violation of patent infringement using "doctrine of equivalents" Lottotron's expert witness, Mr. Stacy A. Friedman attempted to satisfy the belief that the Wagering Formats covered in Lottotron's '865 Patent regarding the "kind of lottery games that are available, such as Keno, Lotto and 3- or 4- digit lotteries" was 'insubstantially different' to those games offered on ISI's Sportsbetting.com website. All the quotes herein in this section unless stated otherwise is attributed to the document, *Lottotron, Inc., v. EH New Ventures, Inc., et al.*, Civ. No 09-4942, Expert Report of Stacy A. Friedman (D.N.J) Nov. 18 2010.

Before addressing the two tests to prove an insubstantial difference of the Wagering Formats, Mr. Friedman states on page 3 in the INTRODUCTION, sub-section 6, that 'I understand that although there are several tests for determining equivalents, no one test is preferred for such determination and also understand from counsel that an analysis of infringement under the doctrine of equivalents is performed from the viewpoint of current technology and art.'

RESPONSE: I disagree with Mr. Friedman on two counts. First, I refute that there is 'no one test is preferred such determination' when such case law exists (Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 91997) and as was adhered to my in **SECTION III. PROOF OF SUBSTANTIAL DIFFERENCE** substantiating a clear delineation in the Wagering Formats covered in the '865 Patent and ISI's casino games.  Second, I also disagree with the doctrine of equivalents being performed from the viewpoint current technology and art when the Patent application was submitted on Jan. 16th, 1997, granted July 13th, 1999 and no longer valid as of the beginning of 2010. In contrast to the above statement of the viewpoint of the currently technology and art, I have been informed by counsel and have accordingly assessed the patent as a person skilled in the art *at the time the patent was issued.* Evaluating the likeness of ISI's casino style games to that of the Wagering Format defined in the '865 (now expired) Patent by the future potential likelihood of Canadian state lottery provider (Loto-Quebec's) to launch an online casino, is flawed thinking.   (To discuss further in the following paragraph)

This flawed thinking provides an elegant transition to Mr. Friedman's two tests for determining if the games on ISI's sites are substantially equivalent to the "kind of lottery games that available through state lotteries, such as Keno, Lotto and 3- and 4- digital lotteries."

The first test Mr. Friedman cites specifically relates to the 'nature of the invention'. In the beginning of his assessment, Mr. Friedman tries to emphasize the purpose of the patent to be a 'generic "wager acceptance system' <u>regardless if the underlying game being wagered upon</u>". He goes on to say that "I believe the invention of the '865 patent lies in the technology platform accepting wagers on different platforms not in the content of the games themselves'.

I remain confused by the assessment in that not only it does not prove the required test 'that the games on ISI's website are '"insubstantially different' from the "kind of lottery games that are available, such as Keno, Lotto and 3- and 4- digital lotteries", but actually further differentiates ISI's product offering (games and the platform) as significantly different. The acceptance wagering platform as described in the '865 Patent does not cover the vast majority of functionality required to take wagers on casino like games such as that on ISI's website. The input points, rules and information needed to place a wager on casino games, including ongoing participation and wager changes, require vastly different programming and wager acceptance platforms than that taught by the '865 patent, which only needs and takes numbers, number of tickets, and prespecified amounts for a ticket.   (See **SECTIONIII.PROOF OF SUBSTANTIAL DIFFERENCE,** Subsection 11 for further detail of the requirements for a remote gaming platform of which the 'acceptance portion is only a sub-section of one module). As an expert in the field of online gaming, I would argue that the acceptance wagering platform covered in the '865 Patent and the underlying platform offered on the ISI website are vastly different for the reasons mentioned in **SECTION III.**

Mr. Friedman then goes on to contradict himself by reverting back to the content, specifically citing the product offering of a 1994 Bally Gaming Video Lottery Machine ("VLT")*Id. p 5-6*. In the flawed thinking in this example, Mr. Friedman believes it is acceptable to simply apply the 'doctrine of equivalents' to <u>any</u> game <u>could </u> be available on a land-based VLT <u>potentially</u>

offered by a state lottery.   This is completely ignoring the "Function, Way and Results" test of the Wagering Format and the programming necessary to run same.  Specifically in this case, the physical proximity of two unrelated games located on a box that is offered by the one operator in land base environment has no bearing the likeness of the two games in and of themselves.  The thinking is fundamentally flawed and in my expertise should be viewed as an acceptable result for the test for the 'doctrine of equivalents' for this case.

Mr. Friedman in his next section goes on to explore the 'meaning of the "kind of games typically available through state lotteries"'. Despite the court already defining the games in the motion of Summary Judgment to be defined as the "kind of lottery games that are available, such as Keno, Lotto and 3- and 4-digit lotteries", Mr. Friedman attempts to expand the definition by citing the only two states in the United States (South Dakota and West Virginia) that offer Class III (casino style) VLTs (there are 10 states that offer bingo style, Class II VLTs). *Id. p 7-8.*  West Virginia Lottery still uses Class II VLTs and all association with regard to Canadian lotteries offering online casino style games are of no relevance as the patent is assessed as a person skilled in the art ***at the time the patent was issued*** and especially not after the patent was expired.  Similar to that of the Bally VLT reference, Mr. Friedman's assessment is flawed. He, again, completely ignores the "Function, Way and Results" test of the Wagering Formats foregoing the specific remote nature of the patent (See **SECTION II: BACKGROUND OF THE ASSIGNMENT,** Sub-section **'865 Patent Remote Gaming Restrictions**) and selectively intertwining unrelated games that just happen to be offered by the same entity.

1.  In his second test to demonstrate the 'doctrine of equivalence', Mr. Friedman tries to diminish the complex of the underlying game engine of the casino style games by stating that the mathematics of all lottery style games are the same (*Id. p 9-10*). He then goes on to attempt to equate the similarity of the basic mathematics in various lottery games to that of all casino style games (*Id. p 10-12).* Mr. Friedman's logic is once again flawed, this time in its over simplification of the underlying game engine. As I mentioned in **SECTION III**: **PROOF OF SUBSTANTIAL DIFFERENCE** Sub-section 6. **The Underlying Game Engine,** the underlying mathematics of the game engine for the

19

various casino games is complex and is substantially different to that of a lottery style game. Simplifying the complex principles of casino mathematics to that of 'discrete random variables, as defined by ' each game has a list of different possible outcomes each with a known probability of occurring' (Id. p 9) is erroneous and flawed. Mr. Friedman is wrongly trying to tie all games of chance into one over simplified principle for his own benefits.

## V. SUMMARY

In conclusion, in my expert opinion and for the numerous outlined above, I am of the opinion that the ISI casino games and the wagering platforms involved are substantially different and therefore not equivalent to the wagering formats and the process for remote sales of lottery tickets set out by the Lottotron's '865 patent. It was stated in the motion for Summary Judgment, that the relevant inquiry is whether, in the view of one of ordinary skill in the art, the games offered on ISI's website, are "insubstantially different" from the "kind of lottery games that are available, such as Keno, Lotto and 3- and 4-digit lotteries". I believe that for the reasons stated the above in SECTIONS III and IV, there is overwhelming proof that the Wagering Formats defined in the '865 patent is substantially different than that offered on ISI's website. In proving my argument, it became increasingly clear that the arguments made by Lottotron's expert witness, Mr. Stacy Friedman were off tangent, flawed, and at times contradictory.

For a patent that was issued in July 1999 (and a continuation of a series of patents dating back to as early as 1990), to date there has been no commercial implementation or proof of future commercial implementation of the Lottotron patent '865. While the patent is expired earlier this year, I do as an expert in the field online gambling question the viability of such patent.